AGEE, Circuit Judge:
 

 Cleaven Williams stabbed his pregnant wife, Veronica ("Mrs. Williams"), outside a Baltimore, Maryland, courthouse where she had just obtained a protective order against him. Mrs. Williams and her unborn child died from their injuries a few days later. Carlin Robinson, the Personal Representative of Mrs. Williams' estate and Guardian and Next Friend of her children, and Eunice Graves, Mrs. Williams' mother, filed federal and state claims against Baltimore City Police Department (BCPD) officer Daniel A. Lioi. The Complaint alleged that Lioi was responsible for Mrs. Williams' death because he enabled Williams to postpone his self-surrender on a misdemeanor arrest warrant, which provided Williams the opportunity to murder his wife.
 

 We previously affirmed, on interlocutory appeal, the district court's denial of Lioi's motion to dismiss the claims against him as being barred by qualified immunity.
 
 Robinson v. Lioi
 
 ,
 
 536 F. App'x 340
 
 (4th Cir. 2013). Thereafter, Robinson and Graves (collectively "Robinson") amended their complaint to add another BCPD officer, Major Melvin Russell, as a defendant. Following discovery, the district court granted summary judgment to both officers,
 
 Robinson v. Lioi
 
 , No. 1:12-cv-00192-CCB,
 
 2017 WL 2937568
 
 (D. Md. June 30, 2017), concluding that the evidence was not sufficient to allow a verdict in Robinson's favor and, in the alternative, the officers were entitled to qualified and public official immunity.
 

 Robinson now appeals. For the reasons set forth below, we affirm the judgment of the district court.
 

 I.
 

 In reviewing the propriety of granting summary judgment, we consider the facts in the light most favorable to the nonmoving party, here, Robinson, and draw all reasonable inferences in her favor.
 
 See
 

 Doe v. Rosa
 
 ,
 
 795 F.3d 429
 
 , 436 (4th Cir. 2015).
 

 A.
 

 In the summer of 2008, Williams met Deputy Major Lioi and Major Russell of the BCPD's Eastern District in the course of Williams' role as the president of a Baltimore-area community association. The men interacted at a handful of civic events that summer and fall.
 

 The events forming the basis of Robinson's claims occurred over a nine-day period from Sunday, November 9, 2008, when a misdemeanor arrest warrant was issued for Williams' arrest, to Monday, November 17, 2008, when Williams fatally stabbed his pregnant wife.
 

 On the evening of Sunday, November 9, Mrs. Williams obtained a temporary protective order against Williams based on an assault that occurred the prior month in which he physically restrained her and cut off some of her hair. Based on the same incident, the Baltimore City Court Commissioner also issued an arrest warrant for Williams charging him with the misdemeanor offenses of second-degree assault and unauthorized removal of property.
 

 Minutes after the warrant issued, a police dispatcher notified BCPD Officer Jose Arroyo that a misdemeanor warrant was ready to be picked up from the Court Commissioner's office.
 
 [1]
 
 Had Arroyo followed normal procedure, he would have taken the warrant directly to the "hot desk" at Central Records to have it logged
 into the police computer database. J.A. 575. Instead, Arroyo took the warrant to the BCPD's Eastern District office. Arroyo indicated that he sometimes bypassed the normal procedure if a supervisor ordered him to do so, but he could not remember whether anyone had issued such an order regarding this warrant. Nor could he provide any explanation for why he deviated from the procedure this time.
 

 After Arroyo arrived at the Eastern District, an unidentified person instructed him to leave the arrest warrant on the desk handling the Sector 1 region. Arroyo could not recall who told him to leave the warrant there, or why, but the address listed on the warrant for Williams was located in Sector 1. Arroyo knew both Lioi and Russell, and when he was specifically asked if Russell or Lioi had instructed him to bring the warrant to the Eastern District, Arroyo testified that he "d[id]n't recall." J.A. 578. He then clarified that, given the chain of command, he would not have received an order directly from either officer and that he "d[id]n't know" whether either of them had given such an instruction to someone else. J.A. 579-80.
 

 At some point over the weekend, Williams contacted Russell and was concerned that his wife "got papers on him." J.A. 706. Williams asked Russell if he could find out what happened.
 
 [2]
 
 In his deposition, Russell stated that he first learned of the arrest warrant when he returned to work on Monday or Tuesday (November 10 or 11) and Officer Adrienne Byrd showed it to him.
 
 [3]
 
 Russell had observed Byrd holding the warrant for Williams in her hands, but he testified that he never took physical possession of the warrant at that time or later.
 

 Russell later spoke with Williams, confirming that there was a warrant for his arrest and encouraging him to turn himself in. J.A. 451-54, 707. Russell advised that Williams should not wait to turn himself in because if he were arrested on a Friday and his arraignment were to be delayed, he could be detained over the weekend.
 

 Beginning on Monday, police officers attempted to arrest Williams at his residence, but were unsuccessful. J.A. 112, 451-52, 485, 707-08, 762, 815. Russell said he personally went by Williams' residence to arrest him "once, maybe twice," but it was dark and no one answered the door. J.A. 451.
 

 On Wednesday (November 12), Williams texted Russell to say that he would like to turn himself in the following Tuesday in order to have time to raise sufficient bond money. Russell called Williams and encouraged him to turn himself in without delay. J.A. 451-52, 482-83. Later that afternoon, Russell informed Lioi-who was the next senior officer in the Eastern District-that Williams would be turning himself in the next evening. Russell asked Lioi to oversee the process because Russell was not scheduled to work Thursday evening.
 
 [4]
 

 On Thursday afternoon (November 13), Williams texted Russell that he was "running behind," but "should be there in 15." J.A. 480. Russell replied, "K." J.A. 480. Both men stated in their depositions that the texts referred to Williams self-surrendering, but Williams did not show up at the station that afternoon.
 

 Instead, at about 9:00 p.m., Williams arrived at the Eastern District to self-surrender. Lioi called Central Records to get the arrest warrant and learned that it had not been logged into their database and they did not have the warrant. Lioi enlisted help in searching for the warrant at the Eastern District and in calling other possible locations, but no one could locate it. For example, Lioi called Russell to see if he could help them locate the warrant, but Russell did not answer his phone, so Lioi left him a voice mail message. And when Lioi called the court commissioner, he was told "that the warrant possibly could be at the North Avenue Courthouse," which he also tried to reach, but it was closed for the night. J.A. 562.
 

 After concluding that they were not going to promptly locate the arrest warrant, Lioi allowed Williams to leave the Eastern District station so long as he agreed to return once they found the warrant. Williams agreed and asked if he could self-surrender after the weekend. He mentioned having several things to do and not wanting to risk being detained if the arraignment was delayed on Friday. It's not clear from the record what agreement Lioi and Williams reached at that time, but Williams departed the police station.
 

 Shortly thereafter, Russell returned Lioi's call and recommended that Lioi contact Byrd because he had seen her with the warrant earlier that week and believed she had attempted to arrest Williams. In addition, Russell suggested that Lioi search Byrd's patrol car for the paperwork.
 

 After Russell's call, Sergeant Todd Tugya, who was helping Lioi search for the warrant, telephoned Byrd. She "advised that she did, indeed, have possession of the warrant ... and that she had attempted to serve it. However, she advised that she left the warrant in the visor of her patrol car because she intended to continue her attempts to serve it on her next shift." J.A. 112. She told Tugya which patrol car she had used, so that they could search it.
 
 [5]
 
 Just after midnight on Friday (November 14), officers located the warrant over the visor of Byrd's patrol car.
 

 Later that day, Lioi "confirmed" with Russell that Williams could self-surrender after the weekend. J.A. 277. Russell indicated to Lioi that was "fine." J.A. 277. Lioi also called Williams to let him know they had found the warrant and he needed to turn himself in. Williams indicated he would self-surrender on Tuesday, and Lioi agreed.
 

 Later that evening, Williams contacted Lioi and said that he was meeting with his lawyers to prepare for his criminal case. Williams suggested that having a letter
 explaining that he had attempted to self-surrender, but that the warrant could not be located, may help him in court. Lioi agreed to write the letter because those were "the facts." J.A. 285. His letter explained that Williams had been "very cooperative and willing to turn himself in" but that Central Records did not have the warrant on file and had "advised that the warrant was being held at North Avenue Court House, which was closed for the night." J.A. 631.
 

 Williams later asked Lioi for a second letter because his lawyers had discovered an arrest warrant from another Maryland locality charging a "Cleaven Williams" with offenses unrelated to those known to be pending against him. Williams asked Lioi to write about that warrant, too; Lioi provided a letter stating that he had reviewed the other arrest warrant and observed that it contained minimal identifying information about the named individual, referenced an address that "[t]o [Lioi's] understanding[,] [Williams] had never resided at," and that the wanted individual "should not be considered to be [Williams] based on the name alone." J.A. 632. In texting about the letters, Williams asked Lioi for "an overview of the night" and "not too much detail." J.A. 101. When Lioi agreed, Williams expressed his appreciation, texting "There is a method to my madness:- /," to which Lioi replied, "That's what I'm afraid of." J.A. 101.
 

 On Monday afternoon (November 17), Williams and Lioi exchanged another set of text messages-
 

 [Williams:] ... I just left my home 2 meet w/my lawyer...I saw my wife drive by...can I go home or what?
 

 [Lioi:] I wouldn't be alone with her. She could say you did anything. Have a witness with you if you meet.
 

 [Williams:] Thanks Dan[.]
 

 [Williams:] Can she do another protection order & try 2 keep me from the house?
 

 [Lioi:] She could. I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.
 

 J.A. 559. Williams later called Lioi from his lawyer's office to discuss the two warrants again, at which time Lioi "t[old] him that he should, you know, turn himself in, the weekend's over, let's get this taken care of today." J.A. 286. Williams indicated Tuesday was still better, and Lioi told him to call after leaving the lawyer's office.
 

 A few hours later, Williams stabbed his wife, which resulted in her death and that of her unborn child.
 
 [6]
 

 B.
 

 Robinson filed a complaint in Maryland state court alleging that Lioi was liable for Mrs. Williams' death under several state and federal laws. Lioi removed the case to the U.S. District Court for the District of Maryland and moved to dismiss on the basis of qualified immunity.
 
 [7]
 
 The district court denied Lioi's motion. He appealed, and we affirmed in an unpublished decision.
 
 Robinson
 
 ,
 
 536 F. App'x at 340
 
 .
 

 Critically, our decision on the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) necessarily accepted as true all of the allegations in Robinson's Complaint.
 

 Id.
 

 at 341
 
 . On that basis, we concluded
 that the Complaint adequately alleged that Lioi engaged in affirmative acts that could make him liable to Robinson for a violation of Mrs. Williams' due process rights under the state-created danger doctrine.
 

 Id.
 

 at 343-44
 
 (discussing the development of the doctrine that had its genesis in
 
 DeShaney v. Winnebago Cty. Dep't of Soc. Servs.
 
 ,
 
 489 U.S. 189
 
 ,
 
 109 S.Ct. 998
 
 ,
 
 103 L.Ed.2d 249
 
 (1989) ). Robinson alleged that Lioi "withheld the warrant [from the unit that should have served it] so that [the Eastern District] could retain control over whether it would be served or not;" "warned Mr. Williams of the warrant and their feigned efforts to serve him;" "purposefully refused to serve or arrest [Williams when he self-surrendered], falsely claiming instead that the warrant allegedly could not be found. This was an intentional and malicious act ... for the purpose of allowing Mr. Williams to remain free despite the warrant;" and "placed Mrs. Williams in a police-created zone of danger by intentionally conspiring with Mr. Williams to permit him to remain free despite ample opportunity to arrest him." Complaint at 4-5, 9,
 
 Robinson v. Lioi
 
 , No. 1:12-cv-00192-CCB,
 
 2012 WL 2992251
 
 (D. Md. July 18, 2012), ECF No. 2.
 

 When we considered whether Lioi was entitled to dismissal of the claims against him, we specifically pointed to these allegations as the basis for our decision.
 
 Robinson
 
 ,
 
 536 F. App'x at 341, 344
 
 . We concluded that, as a whole, these allegations encompassed affirmative acts that could have "directly enabled" Williams to harm Mrs. Williams.
 

 Id.
 

 at 345
 
 . Accordingly, we held that the Complaint adequately alleged a due process violation for Rule 12(b)(6) purposes.
 

 In so doing, we rejected Lioi's reliance on
 
 Town of Castle Rock v. Gonzales
 
 ,
 
 545 U.S. 748
 
 ,
 
 125 S.Ct. 2796
 
 ,
 
 162 L.Ed.2d 658
 
 (2005), in which the Supreme Court held that no due process violation occurred when police officers failed to enforce a restraining order.
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 . We explained that "Lioi's alleged conduct in this case was not confined to a failure to execute [an] arrest warrant," but rather included allegations that he "affirmatively acted to interfere with execution of the warrant by conspiring with Cleaven Williams to evade capture and remain at large."
 

 Id.
 

 C.
 

 After Lioi's prior appeal, Robinson amended her Complaint to add Russell as a defendant. She alleged the following claims against both officers: violation of Mrs. Williams' due process rights, in violation of
 
 42 U.S.C. § 1983
 
 ; conspiracy to violate Mrs. Williams' constitutional rights, in violation of
 
 42 U.S.C. § 1985
 
 ; and numerous Maryland state law claims.
 
 [8]
 
 The alleged factual basis of the claims remained substantively the same as in her original Complaint.
 

 After discovery, Lioi and Russell moved for summary judgment, challenging the substantive claims and arguing that they were entitled to qualified immunity on the federal claims and to public official immunity on the state claims. In addition to deposition statements, affidavits, and other records from the participants in the events described above, Lioi and Russell submitted an affidavit from an expert witness, Stanford O'Neill Franklin, an officer with thirty-four years of law enforcement experience in Maryland, including time with
 the BCPD. In relevant part, Franklin stated that, in his experience, if Williams had "been arrested and processed" following his Thursday evening self-surrender, "he would have been released within 24 hours on his personal recognizance, or required to post minimum bail, which means he would have been back on the street by Saturday morning, November 15, 2008." J.A. 127-28.
 

 The district court awarded summary judgment to Lioi and Russell.
 
 Robinson
 
 ,
 
 2017 WL 2937568
 
 , at *14. It concluded that a jury could not find in favor of Robinson on the substantive question of whether the officers' conduct constituted a state-created danger because Robinson's evidence did not show that Lioi and Russell "committed affirmative acts that created or enhanced the danger to" Mrs. Williams.
 
 Id.
 
 at *9. The district court held in the alternative that Lioi and Russell were entitled to qualified immunity because, even if a violation had occurred, it was not clearly established. The court explained: "the facts are not sufficient to show that a reasonable officer in either defendant's position would have understood he was violating" Mrs. Williams' rights by "using [his] discretion not to aggressively serve an arrest warrant and instead allow Mr. Williams to delay his date of voluntary surrender by several days."
 
 Id.
 
 at *10.
 

 The district court also granted Lioi and Russell summary judgment on Robinson's other claims.
 
 Id.
 
 at *10-14. In relevant part, it held that the conspiracy claims could not survive because Robinson produced no evidence of a conspiracy to violate Mrs. Williams' constitutional rights and no evidence that Lioi's and Russell's conduct caused her death.
 
 Id.
 
 at *10-11. Similarly, the court held that the officers were entitled to summary judgment on the gross negligence claim because Robinson produced no evidence that they intended to injure Mrs. Williams or were so utterly indifferent to her rights that they acted as if her rights did not exist.
 
 Id.
 
 at *11-12. In addition, it held that the causation element had not been satisfied.
 
 Id.
 
 at *12-13. The district court also granted Lioi and Russell summary judgment on the wrongful death and survival actions because they were entitled to public official immunity under Maryland law for any negligent conduct and no evidence supported intentional misconduct or gross negligence.
 
 Id.
 
 at *14. It further concluded those claims would also fail on causation grounds.
 
 Id.
 

 Robinson noted a timely appeal, and the Court has jurisdiction under
 
 28 U.S.C. § 1291
 
 .
 

 II.
 

 Robinson's appeal focuses on the district court's award of summary judgment to Lioi and Russell on her § 1983 substantive due process claim. She contends the record adequately demonstrates that Lioi and Russell committed various affirmative acts that could make them liable under the state-created danger doctrine. Robinson further challenges the district court's alternative holding that the officers were entitled to qualified immunity on the due process claim. Lastly, she challenges its judgment in favor of Lioi and Russell on her state-law claims.
 

 This Court reviews de novo the district court's grant of summary judgment.
 
 Doe
 
 ,
 
 795 F.3d at 436
 
 . Summary judgment is appropriate if the evidence shows that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), such that " 'a reasonable jury could [not] return a verdict for the nonmoving party,' "
 
 Doe
 
 ,
 
 795 F.3d at 436
 
 (alteration in original) (quoting
 
 Anderson v. Liberty Lobby, Inc.
 
 ,
 
 477 U.S. 242
 
 , 248,
 
 106 S.Ct. 2505
 
 ,
 
 91 L.Ed.2d 202
 
 (1986) ).
 

 Stating the standard of review is usually a fairly rote practice, but it has particular significance in this case given the contrast that it signals between this appeal and our prior review of Robinson's allegations. In this case, we are confronted with the view proposed in Robinson's briefs and adopted by the dissenting opinion that the outcome of this appeal should be dictated by our prior decision.
 
 E.g.
 
 , Opening Br. 19 (asserting the district court's opinion "virtually ignored" the Court's prior decision, which had "already held" that Lioi and Russell's conduct fell within the state-created danger theory). Relying on the law-of-the-case doctrine, the dissent accuses us of "rescind[ing] our prior holding, shielding [this] decision ... with the defense that we are now at the summary judgment stage."
 
 Infra
 
 at 340. But there is nothing remarkable in the black-letter law understanding that plaintiffs are held to different standards at different stages of the proceedings in the district court, or that appeals from those decisions are also subject to different standards.
 

 It cannot be put more plainly: we previously considered whether Robinson's
 
 allegations
 
 stated a claim against Lioi because we were considering only the district court's decision to deny a motion to dismiss under Rule 12(b)(6). Now, we are reviewing whether Robinson's
 
 evidence
 
 supports a claim against Lioi and Russell because we are considering the district court's decision to grant a motion for summary judgment under Rule 56(a).
 
 Bennett v. Spear
 
 ,
 
 520 U.S. 154
 
 , 168,
 
 117 S.Ct. 1154
 
 ,
 
 137 L.Ed.2d 281
 
 (1997) (contrasting the pleading stage, where "on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim" with the summary judgment stage, where "a plaintiff must set forth [specific facts] by affidavit or other evidence" (internal quotation marks and alterations omitted)). This "wholly different substantive and procedural context" matters when analyzing Robinson's claim.
 
 See
 

 SD3 II LLC v. Black & Decker (U.S.) Inc.
 
 ,
 
 888 F.3d 98
 
 , 109 (4th Cir. 2018). Unlike the first time this case came before us, we are no longer obliged to accept Robinson's allegations as true. While Robinson is still entitled to have the record viewed in the light most favorable to her, we can no longer simply accept her characterizations of what occurred. Now that the parties have completed discovery, we have a "fully-developed record" to apply "to those allegations upon a motion for summary judgment,"
 

 id.
 

 , and Robinson must present more than a "scintilla" of evidence to support her allegations,
 
 Sylvia Dev. Corp. v. Calvert Cty.
 
 ,
 
 48 F.3d 810
 
 , 818 (4th Cir. 1995) (internal quotation marks omitted).
 

 There is also nothing remarkable in concluding that some plaintiffs whose claims survive a motion to dismiss are unable to meet their burden to survive summary judgment. In
 
 Behrens v. Pelletier
 
 ,
 
 516 U.S. 299
 
 ,
 
 116 S.Ct. 834
 
 ,
 
 133 L.Ed.2d 773
 
 (1996), for example, the Supreme Court held that a defendant was entitled to raise the defense of qualified immunity in more than one interlocutory appeal-initially, after denial of a motion to dismiss, and, subsequently, after denial of summary judgment. The Supreme Court explained that more than one appeal was warranted because
 

 the legally relevant factors ... will be different on summary judgment than on an earlier motion to dismiss. .... It is no more true that the defendant who has unsuccessfully appealed denial of a motion to dismiss has no need to appeal denial of a motion for summary judgment, than it is that the defendant who has unsuccessfully
 
 made
 
 a motion to
 dismiss has no need to
 
 make
 
 a motion for summary judgment.
 

 Id.
 

 at 309
 
 ,
 
 116 S.Ct. 834
 
 .
 

 Nothing inherent in our prior decision or the law-of-the-case doctrine precludes our conclusion in this appeal that Robinson has failed to meet her burden on summary judgment. The law-of-the-case doctrine recognizes that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."
 
 Arizona v. California
 
 ,
 
 460 U.S. 605
 
 , 618,
 
 103 S.Ct. 1382
 
 ,
 
 75 L.Ed.2d 318
 
 (1983). But it poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims.
 
 Wiest v. Tyco Elecs. Corp.
 
 ,
 
 812 F.3d 319
 
 , 329-30 (3d Cir. 2016) (rejecting the plaintiff's argument that because the court had previously held that her complaint sufficiently alleged a claim, the district court was precluded from granting summary judgment under the law-of-the-case doctrine and describing that argument as resting on a "critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56"). Indeed, consistent with this recognition, this Court's articulation of the law-of-the-case doctrine also acknowledges that different facts will lead to a different legal analysis to which the doctrine cannot apply.
 
 Sejman v. Warner-Lambert Co.
 
 ,
 
 845 F.2d 66
 
 , 69 (4th Cir. 1988) (stating that the law-of-the-case doctrine applies "unless" one of several exceptions applies, including the subsequent development of "substantially different evidence").
 

 As the dissent acknowledges, nothing in the law-of-the-case doctrine or our prior decision compelled a particular result in this appeal except to the extent the facts remained the same as the allegations.
 
 Infra
 
 at 340-42. The cases the dissent relies on to support the doctrine's applicability reiterate that when a court is presented with a different record at a new stage of the case, the law-of-the-case doctrine will no longer constrain the court's review.
 
 E.g.
 
 ,
 
 TFWS, Inc. v. Franchot
 
 ,
 
 572 F.3d 186
 
 , 191 (4th Cir. 2009). But only when the facts alleged in a complaint are subsequently proven during discovery will the law-of-the-case doctrine continue to govern how the law applies to those facts.
 
 U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency
 
 ,
 
 804 F.3d 646
 
 , 665-66 (4th Cir. 2015) (holding that the law-of-the-case doctrine was relevant to the Court's review because the case's evidence developed during discovery and considered as part of the motion for summary judgment "confirmed the existence of the[ ] facts" previously relied on in considering the propriety of a motion to dismiss).
 

 Discovery produced substantially different facts than Robinson alleged in her Complaint which requires us to alter our understanding of the factual underpinnings of Robinson's claim for purposes of summary judgment. Based on this divergence, the law-of-the-case doctrine does not constrain our review of how the governing legal principles apply to Robinson's claim. At bottom, the evidence that Robinson marshaled during discovery demonstrates that Russell and Lioi's conduct cannot support a state-created danger substantive due process claim and that the officers are entitled to qualified immunity.
 

 III.
 

 Individuals can hold state actors liable under § 1983 for deprivations of "any
 rights, privileges, or immunities secured by the Constitution,"
 
 42 U.S.C. § 1983
 
 , including deprivations of a person's "life, liberty, or property, without due process of law," U.S. Const. amend. XIV. Because the Due Process Clause protects individuals "against arbitrary action of government," with "arbitrary" in this context encompassing "only the most egregious official conduct," no constitutional violation occurs where the state actor "negligently inflicted harm."
 
 Cty. of Sacramento v. Lewis
 
 ,
 
 523 U.S. 833
 
 , 845-46, 49,
 
 118 S.Ct. 1708
 
 ,
 
 140 L.Ed.2d 1043
 
 (1998) (internal quotation marks omitted).
 

 Moreover, the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."
 
 DeShaney
 
 ,
 
 489 U.S. at 195
 
 ,
 
 109 S.Ct. 998
 
 . And "because 'the Due Process Clause does not require the State to provide its citizens with particular protective services, [state actors] cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.' "
 
 Doe
 
 ,
 
 795 F.3d at 437
 
 (quoting
 
 DeShaney
 
 ,
 
 489 U.S. at 196-97
 
 ,
 
 109 S.Ct. 998
 
 ).
 

 Based on this understanding of the Due Process Clause, the Supreme Court held in
 
 DeShaney
 
 that a county social services department had not violated a four-year-old's substantive due process rights by failing to protect the child from his abusive father.
 
 489 U.S. at 191-94
 
 ,
 
 109 S.Ct. 998
 
 . The department had received numerous reports of abuse but failed to remove the child from his father's custody.
 

 Id.
 

 at 192-93
 
 ,
 
 109 S.Ct. 998
 
 . The Supreme Court recognized that although "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection" based on a "special relationship," no such relationship existed in this case because the child was not in the State's custody (e.g., through "incarceration, institutionalization, or other similar restraint of personal liberty") when his father harmed him.
 

 Id.
 

 at 197-200
 
 ,
 
 109 S.Ct. 998
 
 . As part of its due process analysis, the Supreme Court observed that the department was also not liable because, "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."
 

 Id.
 

 at 201
 
 ,
 
 109 S.Ct. 998
 
 . "This language in
 
 DeShaney
 
 is commonly acknowledged as the genesis of the state-created danger doctrine."
 
 Robinson
 
 ,
 
 536 F. App'x at 343
 
 .
 

 But the state-created doctrine is a "narrow" exception to the general rule that state actors are not liable for harm caused by third parties.
 
 Doe
 
 ,
 
 795 F.3d at 437
 
 . It applies only when the state affirmatively acts to create or increase the risk that resulted in the victim's injury. Specifically, "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."
 

 Id.
 

 at 439
 
 . A direct, affirmative act is necessary because liability is premised on the understanding that state actors cannot "disclaim liability when they themselves throw others to the lions" and that where they have engaged in affirmative conduct that creates or increases "the dangerous situation that resulted in a victim's injury," "it becomes much more akin to a[ ] [state] actor itself directly causing harm to the injured party."
 
 Pinder v. Johnson
 
 ,
 
 54 F.3d 1169
 
 , 1177 (4th Cir. 1995) (en banc). The doctrine's conception of an "affirmative act" is also quite limited: "[i]t cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime
 committed by the prisoners it released."
 

 Id.
 

 at 1175
 
 (internal quotation marks omitted). This narrowly confines the scope of qualifying "affirmative acts" to those that directly create or increase, i.e., cause, the risk a third party posed to the victim.
 

 In this appeal, Robinson argues that the district court erred because the record demonstrates that Lioi and Russell took "affirmative acts" from which a reasonable jury could conclude that they directly increased the risk Williams posed to his wife.
 
 [9]
 
 To support her argument that the officers are liable for a state-created danger, Robinson relies on the following eight "affirmative acts" that she claims made summary judgment inappropriate:
 

 (1) Lioi "acted affirmatively" to free Williams from the Eastern District station after he could not locate the arrest warrant instead of placing Williams under arrest without the warrant and temporarily detaining him in the holding cell while the search for the missing warrant continued;
 

 (2) Lioi "affirmatively agreed" to permit Williams to remain free between the time Williams tried to self-surrender and the time of Mrs. Williams' stabbing;
 

 (3) Lioi wrote two letters to Williams "in an effort to aid Williams in avoiding lawful arrest on valid warrants";
 

 (4) "Lioi texted Williams regarding when it was safe to return home without fear of arrest and how to avoid service of his warrant";
 

 (5) "Lioi prevented other officers from attempting to arrest" Williams by not assigning anyone to serve the arrest warrant and not logging it into a system that would have allowed other officers to serve it;
 

 (6) "Russell ordered that the warrant not be logged in with Central Records";
 

 (7) "Russell orchestrated the unavailability of the warrant during" the time when Williams appeared to self-surrender; and
 

 (8) "Russell affirmatively ordered that Williams not be arrested" after the warrant was located.
 

 Opening Br. 17-18.
 

 Having reviewed the record, we conclude that Robinson's arguments lack merit. Contrary to Robinson's argument and the dissent's conclusion, discovery did not strengthen her earlier allegations that BCPD officers actively conspired to help Williams avoid arrest by interfering with the execution of his arrest warrant. Quite to the contrary. Even viewing the evidence in Robinson's favor, none of the "affirmative acts" she relies on can support a due process claim. Our conclusion follows from a straight-forward application of the Supreme Court's decisions in
 
 DeShaney
 
 and
 
 Town of Castle Rock
 
 , as well as this Court's decisions in
 
 Pinder
 
 and
 
 Doe
 
 .
 

 As discussed in greater detail below, most of Robinson's characterizations of the record are not supported by the record or are pure speculation. Several of Robinson's key allegations in her Complaint concerning Lioi's supposed affirmative acts ultimately proved to be untenable. And other distinctions between Robinson's allegations in her Amended Complaint and the evidence now in the record show that her claim is mostly based on conduct properly categorized not as legally cognizable affirmative acts, but as nonactionable inactions and omissions.
 

 Equally fatal to Robinson's claim, she has failed to produce evidence demonstrating the requisite causal link between the officers' purported "affirmative acts" and the harm that befell Mrs. Williams. Without evidence to support the conclusion that their conduct increased the danger Williams posed to his wife, we can hold neither Lioi nor Russell liable under the state-created danger doctrine. In short, what occurred in this case is not the sort of conduct that the Supreme Court or this Court has said can give rise to liability. The state-created danger doctrine requires proof that Lioi or Russell
 
 created
 
 the harm that befell Mrs. Williams or
 
 directly
 
 "render[ed] [her] any more vulnerable to" Williams.
 
 Doe
 
 ,
 
 795 F.3d at 438
 
 (emphasis omitted) (quoting
 
 DeShaney
 
 ,
 
 489 U.S. at 201
 
 ,
 
 109 S.Ct. 998
 
 ). That is, it requires proof that Lioi or Russell were more than merely negligent or that they could have done more to ensure Williams was arrested earlier, which is the most that Robinson's and the dissent's view of the record allows.
 

 A. Lioi's Letters and Texts to Williams Cannot Support Liability
 

 The record confirms that Lioi wrote two letters at Williams' request and responded to a few texts Williams sent between his attempted self-surrender Thursday evening and Mrs. Williams' murder the following Monday. Robinson, however, mischaracterizes those acts and draws conclusions that the record does not support.
 
 [10]
 
 These events cannot support a state-created danger claim because the record does not allow for the conclusion that they created or increased the risk Williams posed to his wife.
 

 Before turning to the legal principles, it is necessary to first understand what the record shows Lioi actually did. Robinson points to the letters Lioi wrote for Williams, which she characterizes as giving Williams " 'get out of jail free' cards." Opening Br. 27. Neither letter provides any such instruction or request. The first letter truthfully describes the contents of the arrest warrant, Williams' voluntary appearance at the Eastern District station "to turn himself in to be processed," and his permitted departure when "Central Records did not have the warrant on file." J.A. 631. It also truthfully states that when Lioi decided to allow Williams to leave, he had been told that the warrant may be in the courthouse, which was closed for the night.
 

 The second letter accurately recounted that another warrant issued by a different Maryland locality sought the arrest of "a Cleaven Williams, black male with no date of birth or any other identifiers such as a social security number, height, weight, etc.," and listing an address that-to Lioi's understanding-had never been Williams' address. J.A. 632. The second letter observed that the arrest warrant's information was "very limited and should not be considered to be [Williams] based on the name alone." J.A. 632.
 

 A jury could not conclude from these letters that Lioi wrote them "in furtherance of a conspiracy to allow Williams to evade arrest ... that ultimately enhanced the danger to Mrs. Williams."
 
 Infra
 
 at 342. Both letters state facts and neither makes any demands on a recipient or requests that anyone who reviewed their contents not arrest Williams on either warrant. Nor is the first letter misleading, as the dissent
 suggests, as Lioi accurately described the events leading to the decision not to arrest Williams on the evening he attempted to self-surrender. The "omission" of additional information about where the warrant was eventually located has no bearing on Williams' cooperation or Lioi's decision to allow him to leave. Similarly, the second letter simply concludes that the warrant had few details; it does not purport to be the result of a thorough investigation or a final conclusion as to the proper subject of the warrant. In short, Robinson has provided no facts to support her continued characterization of the letters as evidence that Lioi "scheme[d] to secure [Williams'] freedom." Opening Br. 28.
 

 Lioi's texts cannot support liability either. Robinson posits that Lioi "texted Williams regarding when it was safe to return home without fear of arrest and how to avoid service of his warrant." Opening Br. 18. The record does not support that characterization of the texts. The texts instead show that Lioi relayed factual information about the status of the warrant
 
 [11]
 
 and its possible execution before Williams' intended self-surrender date
 
 [12]
 
 and that Lioi encouraged Williams to "avoid" Mrs. Williams. J.A. 559 ("I wouldn't be alone with her. .... Have a witness with you if you meet. .... I would avoid her."). Contrary to Robinson's contention, the texts do not reasonably suggest that Lioi was helping Williams to "avoid[ ] his lawful arrest" or otherwise endangering Mrs. Williams in any way.
 
 See
 
 Opening Br. 30.
 

 Nothing else the dissent points to alters this analysis. For instance, the dissent asserts "Lioi had never written such letters before in his twenty years of law enforcement experience."
 
 Infra
 
 at 338 (citing J.A. 287-88). But Lioi never stated that he had not previously written such letters; instead, he responded by reflecting on Williams having been "a community leader" who was "known to us, and one of the key factors in everything would be is he a flight risk, is he attempting to turn himself in, which he did, so I think all that weighed into the - the process." J.A. 287. Even granting Robinson the inference that the letters were a "first," that fact would not allow for any inference concerning Lioi's intent or to connect Lioi's letters to Mrs. Williams.
 

 In addition, the dissent posits that Lioi's texts suggest "his desire
 
 not
 
 to do his job and instead to defer to Williams's prearranged self-surrender schedule."
 
 Infra
 
 at 343. Even accepting the dissent's view, that would show only (1) that Lioi decided not to serve the warrant sooner, a decision amounting to no more than an omission or failure to act that falls under the ambit of
 
 Town of Castle Rock
 
 , or (2) that Lioi may have been negligent in pursuing service of the warrant, a decision that also could not give rise to a due process claim.
 
 See
 

 Lewis
 
 ,
 
 523 U.S. at 849
 
 ,
 
 118 S.Ct. 1708
 
 (stating that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process");
 
 Slaughter v. Mayor & City Council of Balt.
 
 ,
 
 682 F.3d 317
 
 , 321 (4th Cir. 2012) (reiterating that negligence cannot support a due process violation).
 

 Regardless, neither the letters nor the texts can support a cognizable due process claim because they are not causally connected to Mrs. Williams' harm. Whatever "affirmative acts" a plaintiff relies on must have a direct causal connection to the harm that ultimately befell the victim.
 
 See
 

 Doe
 
 ,
 
 795 F.3d at
 
 439 ;
 
 see also
 

 Gray v. Univ. of Colo. Hosp. Auth.
 
 ,
 
 672 F.3d 909
 
 , 916-17 (10th Cir. 2012) (calling "unremarkable" the proposition that a state-created danger claim must prove "a sufficient
 
 causal link
 
 between the danger created by an affirmative act of the State and the harm inflicted upon the victim by a private party");
 
 Kaucher v. Cty. of Bucks
 
 ,
 
 455 F.3d 418
 
 , 432 (3d Cir. 2006) ("[A] specific and deliberate exercise of state authority, while necessary to [state a claim under this theory], is not sufficient. There must be a direct causal relationship between the affirmative act of the state and the plaintiff's harm. Only then will the affirmative act render the plaintiff more vulnerable to danger than had the state not acted at all." (internal quotation marks omitted)).
 

 Neither Lioi's letters nor his texts created any danger to Mrs. Williams. Indeed, Lioi "could not have created a danger that already existed."
 
 See
 

 Doe
 
 ,
 
 795 F
 
 .
 
 3d at 439
 
 (internal quotation marks omitted). As the circumstances of the misdemeanor assault warrant and other evidence in the record indicate, any threat that Williams posed to his wife existed prior to and independent of Lioi's interactions with Williams. Nothing in the record suggests Lioi had any particularized reason to believe that Williams posed an ongoing-let alone imminent-threat to his wife; at most, he knew that probable cause supported issuance of a misdemeanor arrest warrant for assaulting her in the past, which is the only information contained in the arrest warrant. As such, Lioi's letters and texts did not
 
 create
 
 any danger to Mrs. Williams.
 

 Nor did Lioi's letters or texts increase the risk Williams posed to Mrs. Williams. In
 
 Doe
 
 , we held that a state actor did not increase the risk a child predator posed to his victims where the state actor's conduct placed the victims in "no worse position than that in which [they] would have been had [he] not acted at all."
 

 Id.
 

 (first alteration in original) (internal quotation marks omitted). That's precisely the case here. For instance, the record does not indicate that Williams ever showed the letters to anyone, let alone that he used them to avoid arrest. Similarly, it would be patently unreasonable to conclude that texts encouraging Williams
 
 not
 
 to see his wife at all, or at least not alone, heightened any risk to her. Nor can any viable connection be made between any threat Williams posed to his wife and his texts to Lioi concerning the contents of the letters. In short, the letters and texts simply do not establish the requisite connection between Lioi and Mrs. Williams that would create liability under the state-created danger doctrine.
 
 See
 

 Pinder
 
 ,
 
 54 F.3d at 1177
 
 (providing that, to state a claim, there must be evidence that the state actors did something "akin to ... directly causing harm to the injured party").
 

 These "acts" do not constitute the sort of direct acts the state-created danger doctrine requires for a state actor's conduct to create or increase the risk that a third party poses to a victim. As in
 
 Doe
 
 , we conclude that the sort of "downstream, but-for connection alleged here simply stretches the 'affirmative acts' concept too far."
 
 795 F.3d at 442
 
 . Consequently, they cannot support Robinson's claim against Lioi.
 

 B. Russell's Conduct Concerning the Arrest Warrant Cannot Support Liability
 

 The three "acts" Robinson asserts that Russell took do not support her
 claim against him.
 
 [13]
 
 Robinson asserts as fact that Russell "ordered that the warrant not be logged in with Central Records"; "orchestrated the unavailability of the warrant during the attempted surrender"; and "ordered that Williams not be arrested ... even after the warrant was found." Opening Br. 18. But Robinson's characterizations of the record stretch beyond permissible inferences to impermissible speculation. Moreover, they do not demonstrate that Russell engaged in the sort of affirmative acts that created or increased any danger to Mrs. Williams as required for a state-created danger claim.
 

 Even assuming Russell had the warrant "pulled" and routed to the Eastern District office, the record contains no evidence that Russell was aware that the warrant had not been logged into Central Records prior to its arrival there, that he directed that it not be logged into Central Records, or that he instructed his officers not to attempt to arrest Williams. Nor does the record contain evidence to allow the inference that Russell "orchestrated the unavailability of the warrant" when Williams arrived to self-surrender on Thursday, November 13.
 
 See
 
 Opening Br. 18. To support her view, Robinson weaves mischaracterizations of the record with pure speculation to contend that a jury could infer that her allegations actually occurred. That is not a valid means of surviving summary judgment, which requires evidence, not unsupported conjecture.
 
 See, e.g.
 
 ,
 
 Shirvinski v. U.S. Coast Guard
 
 ,
 
 673 F.3d 308
 
 , 320 (4th Cir. 2012) (rejecting plaintiff's "attempt[ ] to build his case through pure inference");
 
 Hinkle v. City of Clarksburg
 
 ,
 
 81 F.3d 416
 
 , 423 (4th Cir. 1996) (holding a claim was "ripe for an adverse summary judgment determination" when "it was based upon a theory without proof" and dependent on "speculation and the piling of inferences");
 
 Barwick v. Celotex Corp.
 
 ,
 
 736 F.2d 946
 
 , 962 (4th Cir. 1984) (rejecting plaintiff's "attempt[ ] to build one vague inference upon another vague inference to produce a factual issue").
 

 By way of background, Robinson relies on a supposed "friendly relationship" between Russell and Williams, Opening Br. 33, pointing out that they communicated via their cell phones throughout the days in question and that Williams used informal language when texting Russell. In addition, she notes that Russell had been to Williams' home and met his family and had discussed a spiritual matter with Williams in the past. These isolated parts of the record do not support Robinson's conclusion that the men were more than professional acquaintances.
 
 [14]
 
 Even if they did, these facts offer no information about Russell's conduct with respect to the warrant.
 

 Robinson also points to a text Williams sent to Russell on Thursday afternoon saying, "I'm running behind. I should be there in 15," J.A. 480, as the basis for accusing
 Williams and Russell of having a "secret meeting," Opening Br. 34. But no evidence suggests that such a meeting occurred, and both men explained that the text referred to Williams intending to self-surrender on Thursday earlier than when he eventually arrived. Moreover, neither the text nor even an imagined secret meeting could demonstrate that Russell made the warrant unavailable or did anything else regarding the warrant; Robinson is impermissibly piling inference upon inference to reach her desired conclusion.
 

 Next, Robinson takes Lioi's deposition testimony concerning the decision to let Williams leave the Eastern District Thursday evening and speculates that Russell and Williams "had already agreed" to a Tuesday surrender date because Russell "assured that the warrant [would be] unavailable" on Thursday. Opening Br. 34-35. That conjecture is an unsupported reading of what Lioi said. Instead, Lioi testified that prior to allowing Williams to leave on Thursday evening, he ensured that Williams agreed to return and self-surrender once the warrant was found. Lioi knew that "Russell had communicated with [Williams] that if he turn[ed] himself [in] on a Friday, [he] could get stuck in the system all weekend." J.A. 277. Williams told Lioi he wanted to wait to turn himself in until after the weekend. Lioi then confirmed with Russell that this would be acceptable. Contrary to Robinson's contention, Lioi's statement does not permit the inference that Russell and Williams had previously arranged for a Tuesday self-surrender because Russell knew (or orchestrated that) Williams would not be able to self-surrender on Thursday. Nor does Lioi's statement support
 
 any
 
 conclusion about Russell and the location of the warrant.
 

 Robinson further posits that Russell put the warrant in the visor of Officer Byrd's squad car, where it was found several hours after Williams attempted to self-surrender. As "proof" for that conclusion, Robinson points to evidence that Russell saw Officer Byrd with the warrant earlier, that Byrd denied having put the warrant in the visor, and that Russell suggested Lioi search there for the warrant. The conclusion Robinson draws from the gaps between these three fragments leaps well beyond the bounds of permissible inferences and crosses into rampant speculation. Although Robinson is entitled to all reasonable inferences in her favor, we cannot ignore undisputed evidence that contradicts her allegations. Russell explained that he suggested to Lioi several places where the warrant might have been, based on his past experience and knowledge of where officers habitually put paperwork. J.A. 456-58. What's more, Tugya stated that the warrant was eventually located based on specific information Byrd provided to them via telephone Sunday evening.
 
 [15]
 
 No jury could conclude that Russell orchestrated the warrant's unavailability on Thursday evening when the evidence shows that Russell provided Lioi with general information about the warrant's
 whereabouts and that same evening Byrd confirmed with specific information about its location.
 

 Nor do any of the dissent's additional considerations connect the dots between record evidence and facts from which a jury could hold Russell liable. For instance, the dissent overstates what could be reasonably inferred from Byrd's inability to remember the details of her role in these events. She testified only that she did not "recall" driving to Williams' residence to attempt to arrest him; she was not sure what had happened to the paperwork on Williams; and she did not know prior to her deposition that the warrant was found in the visor of her patrol car. J.A. 106. Byrd's testimony does not implicate Russell in anything, nor does it give rise to the inference that he took the paperwork from Byrd and hid it in her patrol car. Simply put, a witness's statement that she does not know that something happened or how it happened is not affirmative evidence that something else happened or how.
 

 This commonsense conclusion is particularly apt given the additional evidence in the record that fills in gaps in Byrd's recollection in a way that contradicts Robinson's speculation as to Russell's conduct. Specifically, Tugya's affidavit states that when he called Byrd during the Thursday evening search for the warrant, she advised that she had put the warrant in the visor of her patrol car earlier in the day, that he tracked down which patrol car she had used, and that officers found the warrant. Thus, the record evidence shows that Russell's conversation with Lioi led officers to Byrd and eventually to the discovery of the warrant. No reasonable jury could conclude in the face of this evidence that Russell had orchestrated the warrant being unavailable when Williams' self-surrendered or that Russell conspired to help Williams to evade arrest.
 

 To bolster its conclusion that Russell could be held liable, the dissent takes certain statements out of context to create the illusion that Russell's willingness to allow Williams to self-surrender was unprecedented. But the record demonstrates that Lioi estimated 15 to 20 people a year would self-surrender in the Eastern District, and Russell agreed that sounded right. J.A. 468. And while Russell admitted that "it could have been the only time" at the Eastern District that someone called and said he would self-surrender "more than 24 hours after the call," he immediately stated that "during [his] tenure, that has happened not an enormous amount, but it has happened before." J.A. 469. Moreover, Russell and Lioi stated repeatedly that the turn-ups revealed that Williams was not staying at his residence; that they did not know his precise whereabouts; that they repeatedly encouraged him to turn himself in; and that they wanted to keep him communicating and cooperating with them rather than go silent, so they were willing to have him return to self-surrender.
 

 To recap, the record demonstrates at most that Russell had the arrest warrant "pulled" and routed to the Eastern District. But the record does not support either Robinson's or the dissent's remaining characterizations of Russell's behavior during the events in question. When comparing this proper view of the record against what is required to survive summary judgment, Robinson has not proffered sufficient evidence to show that a jury could find that Russell's conduct created or increased any danger to Mrs. Williams. Russell could not create a pre-existing danger.
 
 See
 

 Doe
 
 ,
 
 795 F.3d at 439
 
 . Nor would his "act" of pulling the warrant to the Eastern District be the sort of conduct that could
 render him liable under the state-created danger theory. Not every act that could possibly "make[ ] injury at the hands of a third party more likely" gives rise to liability, only acts that are "more akin to ... directly causing harm" to Mrs. Williams would do so.
 
 Pinder
 
 ,
 
 54 F.3d at 1175, 1177
 
 . Russell's decision had only the sort of "downstream, but-for connection [that] simply stretches the 'affirmative acts' concept too far."
 
 Doe
 
 ,
 
 795 F.3d at 442
 
 . As such, this cannot be the basis of a state-created danger due process claim against Russell.
 

 C. Lioi and Russell's Decisions to Allow Williams to Leave the Eastern District Office and Self-Surrender "After the Weekend" Cannot Support Liability
 

 What remains is Robinson's reliance on Lioi and Russell's decisions relating to Williams' attempted and agreed-to self-surrenders.
 
 [16]
 
 Given the evidence that developed at discovery, Robinson's argument concerning these events merely recharacterizes inactions or omissions related to executing a misdemeanor arrest warrant, conduct that makes this case indistinguishable from
 
 Town of Castle Rock
 
 ,
 
 DeShaney
 
 ,
 
 Pinder
 
 , and
 
 Doe
 
 .
 

 Given the "narrow limits ... to establish § 1983 liability based on a state-created danger theory," it is unsurprising that plaintiffs often attempt to recharacterize inactions and omissions as affirmative acts to satisfy their pleading and proof obligations.
 
 Doe
 
 ,
 
 795 F.3d at 439
 
 . What is more, we have previously cautioned that "courts should resist the temptation" to accept plaintiffs' attempts to "artfully recharacterize[ ]" inaction as action.
 
 Pinder
 
 ,
 
 54 F.3d at
 
 1176 n.*.
 

 In
 
 Pinder
 
 , we observed that a plaintiff brought "purely an omission claim" when she argued that a police officer had affirmatively acted to enhance the danger posed by her ex-boyfriend when the officer reassured her that the ex-boyfriend would be "locked up overnight," but then decided to charge the ex-boyfriend with less serious offenses that resulted in his immediate release.
 

 Id.
 

 at 1172, 1176
 
 . That decision proved fatal, as it allowed the ex-boyfriend to return to the plaintiff's home and set it on fire, resulting in the deaths of the plaintiff's three children.
 

 Id.
 

 at 1172
 
 .
 

 In analyzing the plaintiff's state-created danger claim, we explained that "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by" the ex-boyfriend, not by the officer.
 

 Id.
 

 at 1175
 
 . "[T]he state did not 'create' the danger, it simply failed to provide adequate protection from it," meaning that, at most, the state actors "stood by and did nothing when suspicious circumstances dictated a more active role."
 

 Id.
 

 (internal quotation marks omitted). We held that the officer's conduct could not support a claim and further cautioned that were we to accept the plaintiff's definition of an "affirmative act," "every representation by the police and every failure to incarcerate would constitute 'affirmative actions,' giving rise to civil liability."
 

 Id.
 

 A decade after our decision in
 
 Pinder
 
 , the Supreme Court reiterated that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations."
 
 Town of Castle Rock
 
 ,
 
 545 U.S. at 768
 
 ,
 
 125 S.Ct. 2796
 
 . As often occurs in this type of case,
 
 Town of Castle Rock
 
 arose out of "horrible" circumstances-a woman obtained a restraining order against her husband, but the order gave him the right to visit the home to have limited interaction with the couple's three children on alternating weekends and, "upon reasonable notice," allowed for a "midweek dinner visit."
 

 Id.
 

 at 751-52
 
 ,
 
 125 S.Ct. 2796
 
 (internal quotation marks omitted). Without any notice or coordination with his wife, the husband took his daughters from the home early on a weekday evening.
 

 Id.
 

 at 753
 
 ,
 
 125 S.Ct. 2796
 
 . When she discovered their absence, the wife called the police and asked them to enforce the restraining order.
 

 Id.
 

 The police "refused to do so," telling her to wait until 10:00 p.m. to see if the husband returned the girls home.
 

 Id.
 

 (internal quotation marks omitted). She called the police again at 10:00 p.m. because they had not returned, and the police told her to wait until midnight.
 

 Id.
 

 She called a third time shortly after midnight, then went to her husband's apartment and found it empty, called the police again, and was told to wait for a police officer to arrive.
 

 Id.
 

 When no officer arrived, she went to the police station to file a report.
 

 Id.
 

 at 753-54
 
 ,
 
 125 S.Ct. 2796
 
 . "The officer who took the report made no reasonable effort to enforce the [restraining order] or locate the three children. Instead, he went to dinner."
 

 Id.
 

 at 754
 
 ,
 
 125 S.Ct. 2796
 
 (internal quotation marks omitted). About two hours later, the husband appeared at the police station and opened fire.
 

 Id.
 

 After the husband was killed, police discovered that he had already murdered his three daughters.
 

 Id.
 

 The Supreme Court rejected the wife's claim that the police officers violated the Due Process Clause by "fail[ing] to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order."
 

 Id.
 

 at 751
 
 ,
 
 125 S.Ct. 2796
 
 . It observed that, despite the language mandating enforcement of the restraining order, "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."
 

 Id.
 

 at 760
 
 ,
 
 125 S.Ct. 2796
 
 . The Supreme Court noted that even if enforcement was mandatory, "that would not necessarily mean that" a private citizen has an "entitlement" to the enforcement of such an order.
 

 Id.
 

 at 764-65
 
 ,
 
 125 S.Ct. 2796
 
 . And, in any event, the Court concluded that any such right under state law would not necessarily "constitute a 'property' interest for purposes of the Due Process Clause."
 

 Id.
 

 at 766
 
 ,
 
 125 S.Ct. 2796
 
 . Consequently, the wife "did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband."
 

 Id.
 

 at 768
 
 ,
 
 125 S.Ct. 2796
 
 . In so holding, the Court cautioned that the Fourteenth Amendment should not be treated "as a font of tort law."
 

 Id.
 

 (internal quotation marks omitted);
 
 see also
 

 Slaughter
 
 ,
 
 682 F.3d at 323
 
 (discussing the dangers of constitutionalizing ordinary state tort claims).
 

 At its core, Robinson's claim suffers the same fundamental problem identified in
 
 Town of Castle Rock
 
 ,
 
 DeShaney
 
 ,
 
 Pinder
 
 , and
 
 Doe
 
 -an attempt to turn inactions and omissions into affirmative acts and to convert what might be a basis for state tort liability into a federal constitutional violation. As the Supreme Court recognized in
 
 Town of Castle Rock
 
 , even mandatory language in a temporary
 restraining order-or, here, an arrest warrant-does not strip police officers of enforcement discretion. When Lioi and Russell allowed Williams to self-surrender, they were exercising the long tradition of police discretion concerning the circumstances of enforcing a misdemeanor arrest warrant.
 
 See
 

 Town of Castle Rock
 
 ,
 
 545 U.S. at 760-61
 
 ,
 
 125 S.Ct. 2796
 
 . Exercising this sort of routine police discretion does not give rise to a state-created danger.
 

 Id.
 

 To hold otherwise would turn the thousands of instances where the police agree to allow a charged individual to self-surrender into a conspiracy to evade arrest. No precedent countenances such a reading.
 

 The record reveals the rest of Lioi and Russell's conduct is properly characterized as inaction or omission. For instance, Robinson challenges Lioi's failure to make different decisions when the warrant could not be located after Williams attempt to self-surrender. She further seeks to hold both officers liable for failing to execute the arrest warrant earlier rather than allowing Williams to self-surrender later. Neither of these claims is any different than the claims rejected as mere failures to act on the abuse reports in
 
 DeShaney
 
 and on the failure to enforce the restraining order in
 
 Town of Castle Rock
 
 .
 

 As we observed in
 
 Pinder
 
 , the state does not "commit[ ] an affirmative act [for purposes of the state-created danger doctrine] ... every time it does anything that makes injury at the hands of a third party more likely," and the Due Process Clause does not require state actors to protect individuals from the harms they face from third parties.
 
 54 F.3d at 1175
 
 (internal quotation marks omitted);
 
 accord
 

 Estate of Smithers ex rel. Norris v. City of Flint
 
 ,
 
 602 F.3d 758
 
 , 764 (6th Cir. 2010) (holding police officers not liable under state-created danger doctrine where they arrested an individual and allowed her to leave rather than detaining her on that charge because that exercise of discretion "did not constitute an affirmative act" and did not increase the danger to the victims);
 
 Burella v. City of Phila.
 
 ,
 
 501 F.3d 134
 
 , 146-47 (3d Cir. 2007) (holding police officers not liable under state-created danger doctrine where they did not enforce a court order or follow state law requiring the perpetrator's arrest because what the plaintiff "actually contend[ed] [was] that the officers failed to act," which is not cognizable).
 

 The affirmative act that caused Mrs. Williams' injury was Williams' decision to stab her; "[n]o amount of semantics can disguise [that] fact."
 
 Pinder
 
 ,
 
 54 F.3d at
 
 1175 ;
 
 see
 

 Doe
 
 ,
 
 795 F.3d at 441
 
 (holding that a state actor's decision not to report a known concern is the same as an "officer's decision not to file ... more serious charges," both of which constitute nonactionable omissions). In short, these circumstances do not give rise to liability under the Due Process Clause. Notably, neither Robinson nor the dissenting opinion cites a single case where an officer's failure to serve a misdemeanor arrest warrant or decision to allow an individual to self-surrender constituted an "affirmative act" establishing liability under the state-created danger theory. Nor could they do so, as such acts fail to meet the high standard of being "akin to [the state] actor itself directly causing harm to" Mrs. Williams.
 
 Cf.
 

 Pinder
 
 ,
 
 54 F.3d at 1177
 
 .
 

 Our reliance on
 
 Town of Castle Rock
 
 and conclusion that many of Robinson's arguments are based on facts that are properly characterized as omissions or failures to act do not constitute an "about-face,"
 
 infra
 
 at 340, from our prior decision. We previously recognized the Supreme Court's holding in that case that police officers have discretion in such enforcement and service decisions and cannot be
 liable for exercising that discretion because individuals do not have a property interest in such police enforcement.
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 . We held that Robinson's allegations were distinguishable from
 
 Town of Castle Rock
 
 , however, because "Lioi's alleged conduct ... was
 
 not confined to
 
 a failure to execute the arrest warrant" given that Robinson alleged that he "
 
 affirmatively acted to interfere with execution of the warrant by conspiring
 
 with Cleaven Williams to evade capture and remain at large."
 

 Id.
 

 (emphases added). But after discovery, Robinson has marshaled evidence supporting only conduct that
 
 is
 
 confined to a failure to execute the warrant.
 

 For example, Robinson has presented no evidence to support her allegation that Lioi (or Russell) conspired with Williams to evade arrest by preventing the "proper" domestic violence unit from serving the warrant. To the contrary, the Eastern District officers had the authority to arrest Williams and were responsible for the neighborhood where Williams lived. And while the Complaint alleged that Lioi (or Russell) warned Williams about the existence of the arrest warrant, the record now shows that
 
 Williams contacted Russell
 
 about its possible existence. The Complaint also alleged BCPD officers feigned attempts to serve the arrest warrant, but the record contains no such evidence. And perhaps most importantly, the record lacks evidence to substantiate the Complaint's allegation that Lioi
 
 lied
 
 about not knowing where the warrant was on the evening of Williams' attempted self-surrender or that he falsified information to avoid having to arrest Williams that night. None of those allegations in the Complaint, which were the subject of the motion to dismiss and our prior decision, are borne out by evidence at the summary judgment stage.
 

 Instead, Robinson has presented only recharacterizations of acts that amount to a simple failure to arrest: Lioi allowed Williams to leave the Eastern District rather than detaining him until the warrant-which was in fact missing and which he had been told may be at a location that was closed for the night-was found; that Lioi and Russell did not aggressively pursue Williams' arrest after the warrant was located; and that they agreed to allow him to self-surrender after the weekend. For the reasons stated, all of those "acts" are appropriately characterized as omissions and failures to act, not the sort of affirmative acts originally alleged that would distinguish this case from
 
 Town of Castle Rock
 
 ,
 
 DeShaney
 
 ,
 
 Pinder
 
 , and
 
 Doe
 
 .
 

 Robinson's arguments concerning these events fail for the additional reason that none of Lioi's or Russell's decisions occurred in "the context of immediate interactions between the [state actor] and" Mrs. Williams.
 
 See
 

 Doe
 
 ,
 
 795 F.3d at 441
 
 (alteration in original) (internal quotation marks omitted). In
 
 Pinder
 
 , this Court cautioned that not "every representation by the police and every failure to incarcerate ... constitute[s] [an] 'affirmative action[ ],' giving rise to civil liability."
 
 54 F.3d at 1175
 
 . We concluded that the state's conduct constituted a "fail[ure] to provide adequate protection from" a third party's danger, which is not cognizable, even though the officer in that case explicitly reassured the plaintiff that he would charge the ex-boyfriend with an offense that would keep him detained overnight and then failed to do so.
 

 Id.
 

 Here, no evidence shows that Mrs. Williams or anyone else on her behalf ever approached Lioi or Russell to seek protection from her husband. And the arrest warrant, which simply charged Williams with second-degree assault and named Mrs. Williams as the victim, would have
 provided scant additional information to a reviewing officer. J.A. 764. Contrary to the dissent's assertion, there's no basis to believe that the officers knew that Mrs. Williams was "afraid" of her husband, but even that would not be enough on its own to establish liability for decisions based on that knowledge.
 
 See
 

 Pinder
 
 ,
 
 54 F.3d at 1172
 
 (holding no liability under the state-created danger doctrine for the officer's conduct reassuring the plaintiff of her safety and charging the former boyfriend on lesser charges than he'd promised after having responded to a domestic disturbance call and hearing the plaintiff express fear for herself and her children in light of the boyfriend's abusive and violent conduct and death threats that occurred on the same night). The lack of direct contact between the victim and the officers prevents any conclusion that the officers affirmatively acted and thereby increased the danger to Mrs. Williams. Indeed, this case involves almost no personal knowledge on the part of Lioi or Russell that Williams posed a threat-let alone an ongoing, immediate, or increasingly violent threat-toward Mrs. Williams. In that regard, it is akin to
 
 Doe
 
 , where the record did not show that the defendant met or spoke with the plaintiffs and he "could only speculate that the ... allegations were true and that [the third party] would pose future danger" to the plaintiffs.
 
 795 F.3d at 441
 
 . We observed that this fact-which is also present in this case-meant that the case "st[ood] on weaker ground than" the
 
 DeShaney
 
 claim, where the defendants "knew the child victim and were aware of the specific danger the father posed to him."
 

 Id.
 

 at 441-42
 
 . Even in
 
 Pinder
 
 , where the defendant had also spoken directly with the plaintiff and had specific and immediate knowledge of the risk the third party posed to the plaintiff and her children, the defendant was not liable.
 
 54 F.3d at 1172
 
 . Accordingly, even in the face of much closer interactions between the plaintiff (or victim) and the defendant(s), there was no liability. Here, Lioi and Russell had no "immediate interactions" with Mrs. Williams, so this case is on even weaker ground.
 

 Id.
 

 at 1176 n.*.
 

 Lastly, we note that the record also lacks evidence demonstrating the requisite causal link to Mrs. Williams' death. As the district court noted, the officers proffered an expert witness who opined, given his experience regarding arrests made on the charges against Williams and his background, that Williams would have been free well before Monday afternoon and could have committed the offense even if he were detained when he attempted to self-surrender or if he were arrested earlier. J.A. 128. Williams would have been arrested and detained for only a limited time, then released pending further proceedings. Moreover, there's evidence that even if Williams was not aware of his wife's location at all times during the events in question, he did know where she was at other times besides her courthouse appearance.
 
 E.g.
 
 , J.A. 818, 834. Accordingly, he could have committed the crime on more than one occasion.
 

 Because the evidence concerning these events does not support Robinson's characterization of them as "affirmative acts" creating or increasing a risk to Mrs. Williams, the record does not support a claim under the state-created danger doctrine.
 

 IV.
 

 The above analysis demonstrates why Robinson failed to come forward with sufficient evidence to support her claim that Mrs. Williams' constitutional rights were violated under the state-created danger theory of liability. That same analysis conclusively demonstrates why Lioi and
 Russell are also entitled to qualified immunity, which "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person."
 
 Lawson v. Union Cty. Clerk of Court
 
 ,
 
 828 F.3d 239
 
 , 249 (4th Cir. 2016). Because the evidence was insufficient to support a finding that Lioi and Russell violated Mrs. Williams's constitutional rights, it follows that the district court properly concluded that they were entitled to qualified immunity.
 

 Nonetheless, even if the facts proven during discovery set out a constitutional violation, Lioi and Russell would still have been entitled to qualified immunity because that right was not clearly established. Once again, we note that our consideration of this legal question is governed by the changes in the facts developed during discovery as opposed to those that had been alleged in Robinson's Complaint. We previously affirmed the denial of qualified immunity at the motion to dismiss stage because we accepted Robinson's allegations concerning Lioi's conduct, including the allegations that Lioi actively interfered with the execution of the warrant by lying about not being able to find it on the evening Williams attempted to self-surrender, feigned the BCPD's efforts to arrest Williams, and conspired with him to remain free despite multiple opportunities to arrest him. Based on those allegations we concluded that
 

 in 2008, a reasonable police officer in Lioi's position would have known that a law enforcement officer affirmatively acting in a conspiracy with a third party to avoid arrest on assault charges could give rise to a constitutional violation when the third party acts in furtherance of the conspiracy to injure another person.
 

 Robinson
 
 ,
 
 536 F. App'x at 347
 
 .
 

 As already described at length, the evidence does not allow for the conclusion that Lioi or Russell were lying about the warrant being missing or their inability to serve the warrant. Instead, the record shows that-at most-they agreed to allow a cooperating individual that posed no known immediate risk to self-surrender. And it was not clearly established in 2008 that a decision to allow self-surrender rather than aggressively serve a misdemeanor arrest warrant would serve as a basis of liability under the state-created danger doctrine. Indeed, no case then or now could be taken to stand for that proposition.
 

 "A right is clearly established when the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right."
 
 Pinder
 
 ,
 
 54 F.3d at 1181
 
 . To be sure,
 
 DeShaney
 
 and other cases have acknowledged the existence of the state-created danger theory of liability to establish a due process violation. But in determining whether a right is clearly established, courts do not look at the right "at its most general or abstract level, but at the level of its application to the specific conduct being challenged."
 
 Wiley v. Doory
 
 ,
 
 14 F.3d 993
 
 , 995 (4th Cir. 1994). Although there does not need to be a case identical to the facts of a particular case for the right to be clearly established, there must be a reasonable correlation.
 
 Edwards v. City of Goldsboro
 
 ,
 
 178 F.3d 231
 
 , 251 (4th Cir. 1999). Put simply, a reasonable officer must have been able to ascertain the "apparent" unlawfulness of his conduct "in light of the pre-existing law."
 
 Pinder
 
 ,
 
 54 F.3d at 1173
 
 .
 

 Applying these principles here, while a reasonable officer in 2008 would have notice
 that the state-created danger theory existed in the abstract, no Supreme Court or Fourth Circuit case law would have described when its requirements had been met in
 
 any
 
 particular set of circumstances. Instead, officers would have recognized multiple cases setting forth the general framework that, to be held liable under this doctrine, an officer had to engage in conduct that created or increased "the dangerous situation that resulted in a victim's injury" such that the circumstances were "much more akin to an actor ... directly causing harm to the injured party."
 
 Pinder
 
 ,
 
 54 F.3d at 1177
 
 . But they would have encountered no cases discussing the state-created danger doctrine in the context of serving an arrest warrant. Nor would they have encountered any cases holding an officer liable under the doctrine for harm that arose from an officer's decision to allow a party named on an arrest warrant to self-surrender. The absence of case law in this area coupled with the Supreme Court's statements in
 
 Town of Castle Rock
 
 regarding police discretion executing a warrant means that Lioi and Russell did not have "fair warning that their conduct was unconstitutional" even if we were to conclude that a violation occurred in this case.
 
 Iko v. Shreve
 
 ,
 
 535 F.3d 225
 
 , 238 (4th Cir. 2008). In sum, as the district court held, "[a] reasonable police officer in Lioi and Russell's position could not have known that the failure to guarantee [Williams'] arrest on a misdemeanor warrant prior to [the date of his wife's death] would violate [Mrs. Williams'] constitutional rights."
 
 Robinson
 
 ,
 
 2017 WL 2937568
 
 , at *10. Lioi and Russell are entitled to qualified immunity for this additional reason as well.
 

 V.
 

 Both Robinson and the dissenting opinion contrive to create a genuine issue of material fact through the officers' omissions and "mere speculation or the building of one inference upon another,"
 
 Barwick
 
 ,
 
 736 F.2d at 963
 
 . To survive summary judgment, Robinson had to "do more than present a scintilla of evidence in [her] favor."
 
 Sylvia
 
 ,
 
 48 F.3d at 818
 
 (internal quotation marks omitted). She had to present "sufficient evidence such that reasonable jurors could find by a preponderance of the evidence" for her.
 

 Id.
 

 (internal quotation marks omitted). But Robinson's version of events is not supported by sufficient evidence to permit a reasonable jury to conclude that Lioi or Russell undertook any affirmative acts that would support liability for a state-created danger substantive due process claim.
 
 See
 
 id.
 

 As such, she has not shown that the district court erred in granting the officers summary judgment.
 
 [17]
 

 For the reasons stated, the judgment of the district court is
 

 AFFIRMED.
 

 When a police dispatcher alerts an officer that a warrant is ready to be picked up, the arrestee is not identified.
 
 See
 
 J.A. 549.
 

 In his statement during the internal investigation, Russell said that Williams had called him over the weekend "concerned that his wife, as he described it got some papers on him. He was concerned that his wife lied on him, went down to wherever and got papers on him, and he wanted me to see if that was actually true." J.A. 706.
 

 Russell could not recall whether he returned to work that week on Monday or Tuesday, but stated that the earliest his conversation with Byrd would have occurred was the morning of Monday, November 10. J.A. 445, 470.
 

 Russell and Lioi both stated that Russell did not ask that Williams be given special treatment, but just that "because of [Williams'] role in the community, to make sure this was being taken care of." J.A. 467 (Russell); J.A. 287-88 (Lioi: "Russell said just be at the district and meet him when he comes in to make sure the process goes well, but nobody said, you know, do anything out of the unusual. ... He was a community leader, so just make sure everything goes well and that, you know, he's processed and goes to central booking and they walk him through the system.").
 

 When deposed in this case, Byrd could not recall many of the details surrounding these events. She knew she had received some paperwork on Williams at roll call, but did not recall what the papers were. She also could not recall what happened to the papers; she believed "[s]omeone took the paperwork" from her, but she did not know who or when. J.A. 108. She did not recall trying to serve the arrest warrant or having the papers in her patrol car. J.A. 106-09.
 

 Williams was prosecuted in state court, convicted, and sentenced to life imprisonment for his crime.
 

 Robinson also brought claims against the BCPD and Williams, but the district court separately dismissed those claims and they are not at issue on appeal.
 

 Robinson alleged Maryland claims of wrongful death, survival action, gross negligence, reckless endangerment, intentional infliction of emotional distress, and common law conspiracy.
 

 Robinson's Amended Complaint also appears to have alleged liability based on the existence of a special relationship, but she does not rely on that ground on appeal.
 

 This section specifically addresses Robinson's third and fourth "steps," namely: that Lioi (3) wrote two letters for Williams about the arrest warrants, and (4) texted Williams in the days prior to Mrs. Williams' death.
 

 J.A. 696-97 (responding to Williams' question about whether Mrs. Williams could "resc[i]nd the charges/warrant" with, "No. She should contact the Court Comm[issioner] that she saw, but they won't rescind.").
 

 J.A. 559 (responding to Williams' question about whether his wife could "do another protection order & try 2 keep me from the house" with, "She could. I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.").
 

 This section specifically addresses Robinson's sixth, seventh, and eighth (in part) asserted "affirmative steps," i.e., that Russell (6) ordered Arroyo to divert the arrest warrant so that it would not be logged into the Central Records system; (7) arranged for the warrant to be in the visor of Byrd's vehicle so that it could not be located when Williams arrived to self-surrender; and (8) ordered that no one arrest Williams after the arrest warrant was located.
 

 The dissenting opinion also relies on Russell's supposed "relationship" with Williams and the fact they "spoke of personal matters."
 
 Infra
 
 at 344. The implication from both the dissent and Robinson overstates what the record shows, which is that the men interacted at a handful of community events, that Russell entered Williams' home briefly on one occasion during a community walk that passed by Williams' residence, and that they briefly discussed religion during one of those walks because Russell was also a minister at the time.
 

 The dissent faults us for relying on Tugya's affidavit. But "materials capable of being reduced to admissible evidence at trial" can be the basis for summary judgment even though "hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment."
 
 U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.
 
 ,
 
 64 F.3d 920
 
 , 926 & n.8 (4th Cir. 1995) ;
 
 see
 
 Fed. R. Civ. P. 56(e). To the extent Tugya's affidavit describes what he did during the search for the missing warrant and what effect his conversation with Byrd had on his actions and directions that evening, it is not hearsay and is therefore properly considered.
 
 See
 
 Fed. R. Evid. 801(c) ;
 
 see also
 

 United States v. Safari
 
 ,
 
 849 F.2d 891
 
 , 894 (noting that a statement is not hearsay if it is offered to prove knowledge, or to show the effect on the listener).
 

 This discussion relates to Robinson's first, second, fifth, and eighth (in part) "affirmative acts," namely: that Lioi (1) allowed Williams to leave the Eastern District station instead of detaining him when the warrant could not be readily located; (2) allowed Williams to self-surrender after the weekend even though the arrest warrant was located early Friday morning; (5) did not assign officers to execute the arrest warrant once it was located and did not return the arrest warrant to Central Records for logging; and that Russell (8) allowed Williams to self-surrender after the weekend even though the arrest warrant was located early Friday morning.
 

 Although Robinson's appeal centers on the § 1983 claim, she also challenges the district court's decision to grant summary judgment to Lioi and Russell on her state claims of gross negligence, wrongful death, and survival. Those claims are meritless, and we affirm the district court's judgment on them for the reasons set out in the district court's opinion.
 
 Robinson
 
 ,
 
 2017 WL 2937568
 
 , at *11-14.