**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1880**

KRISTINA G. MCMICHAEL; WILSON MCMICHAEL,

Plaintiff − Appellants,

v.

JAMES ISLAND CHARTER SCHOOL; CITY OF CHARLESTON; OFFICER
THEODORE RYAN BROWN, individually, and acting in his Official Capacity,

Defendant – Appellees.

Appeal from the United States District Court for the District of South Carolina, at
Charleston. Richard Mark Gergel, District Judge. (2:18−cv−00816−RMG)

Submitted: November 2, 2020                    Decided: December 31, 2020

Before KING and DIAZ, Circuit Judges, and Stephanie A. GALLAGHER, United States
District Judge for the District of Maryland, sitting by designation.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge King and
Judge Gallagher joined.

William E. Hopkins, Jr., Joseph C. Hopkins, HOPKINS LAW FIRM, LLC, Pawleys Island,
South Carolina, for Appellants. Christopher T. Dorsel, SENN LEGAL, LLC, Charleston,
South Carolina; Jonathan J. Anderson, Jonathan L. Anderson, ANDERSON REYNOLDS
& STEPHENS, LLC, Charleston, South Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

James Island Charter High School ("JICHS") terminated Kristina McMichael when it eliminated the finance department where she worked. At JICHS's principal's request, Officer Theodore Ryan Brown arranged for continued security to prevent any retaliation by former employees against the school. Brown obtained photos of Kristina and her husband, Wilson McMichael, from the South Carolina Department of Motor Vehicles ("DMV") so security officers could recognize them if they returned to campus uninvited. The McMichaels sued JICHS, the City of Charleston, South Carolina, and Brown, and the district court granted summary judgment to the Defendants. We affirm.

I.

We review a district court's summary judgment order de novo. *Reyazuddin v. Montgomery County*, 789 F.3d 407, 413 (4th Cir. 2015). In doing so, we apply the same legal standards as the district court, viewing all facts and drawing all reasonable inferences in favor of the non-moving party—in this case, the McMichaels. *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). We do not, however, weigh conflicting evidence or make credibility determinations. *Reyazuddin*, 789 F.3d at 413. If the nonmoving party can demonstrate the existence of genuine issues of material fact that can only be resolved by a factfinder, those issues must proceed to trial. *Id*. Genuine questions of material fact exist "where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney*, 673 F.3d at 330.

2

II.

A.

On July 6, 2017, JICHS eliminated its finance department for budgetary reasons and terminated the department's three employees, including Kristina McMichael. Since it was July, and the students were on summer vacation, JICHS had no regular security staff on campus that day. As a safety precaution, JICHS's principal, Tim Thorn, asked Brown, JICHS's school resource officer, to report to campus to supervise the finance department's termination.[1]

Kristina's termination letter stated that JICHS would no longer allow her on campus without an appointment and school escort. After she received the letter, she called her husband, Wilson McMichael, to help take her belongings home. Wilson, who wasn't a school employee, eventually arrived to help his wife clear out her desk. Brown recalled that the McMichaels were "hostile" and "angry" while they were leaving campus. He remembered Kristina being "verbally abusive" to school staff and Wilson saying that the school "would be sorry" for terminating Kristina. J.A. 384:10–387:9.

Thorn asked Brown to coordinate off-duty officers to remain at the school for the duration of the summer to guard against any retaliation by angry former employees. Brown testified that, at the time, he wasn't aware that the McMichaels posed any specific or imminent threat to campus safety, but he also made clear that his "number one job" is

---

[1] The McMichaels object to this and other evidence as hearsay. We address their objections as necessary below.

to prevent violence at the school and that, "with the trend in workplace violence, you don't know who is going to do what when you let somebody go." J.A. 413:3–414:16.

Because the off-duty officers were not familiar with the school, its students, or its employees, Brown created an information packet that identified and described individuals not allowed on campus. It summarized the finance department's elimination, the McMichaels' response to Kristina's termination, and the fact that their son T.M. was also banned from campus after his recent expulsion and arrest for marijuana possession. The packet also noted that other "students have disclosed that [T.M.] sells narcotics at JICHS" and that "allegedly [T.M.] in June 2017 attempted to purchase a firearm but due to currently being out on [b]ond for the [marijuana] charges," the "purchase was denied." J.A. 144–45.

But names and narratives alone wouldn't give the officers all the information they needed. Brown also included pictures of the McMichaels and the other former finance department employees in the information packet so that the officers could identify them. He obtained each photo (except for T.M's) from the South Carolina DMV website.[2] Brown placed the photos on a desk in the security officers' makeshift office inside the school.[3]

---

[2] Brown obtained T.M.'s photo from the website of a juvenile detention center.

[3] The McMichaels argued before the district court that a sign saying "do not let these people in" accompanied the photos on the desk. But the district court ruled that only inadmissible hearsay supported that claim, whereas admissible evidence showed that no such sign existed. The McMichaels don't dispute that ruling on appeal.

4

Several days after Kristina's termination, Marty Monette, JICHS's facilities director, was repairing an air conditioning unit in the security office when he spotted the photographs. He took a picture of the photos with his phone and sent the picture to his wife, Celeste Monette (also a JICHS employee), and Bill Koll (a former finance department employee). Marty then asked Brown about the pictures, and he explained that they were there so security officers could identify anyone on campus without permission.

News of the photographs reached the McMichaels through the gossip grapevine. Marty told Celeste about his conversation with Brown, and then Celeste showed Kristina the picture of the photographs while Celeste and Kristina were out at dinner shortly after Kristina's termination.

B.

The operative Second Amended Complaint, which abandoned Kristina's 18 U.S.C. § 1983 claim and added Wilson McMichael as a plaintiff, alleges claims against: (1) Brown, JICHS, and the City of Charleston for violating the federal Driver's Privacy Protection Act; (2) JICHS for defamation; and (3) Brown, JICHS, and the City for invasion of privacy. The Defendants filed separate motions for summary judgment, which the district court granted in full.

This appeal followed.

III.

A.

We begin by addressing the McMichaels' claim that the Defendants violated the Driver's Privacy Protection Act when Officer Brown obtained their DMV photos without permission. The Act provides that it "shall be unlawful for any person knowingly to obtain or disclose personal information," including photographs, "from a motor vehicle record, for any use" that doesn't fall within one of 14 statutory exceptions.[4] 18 U.S.C. § 2722(a). The exception relevant to this case appears in 18 U.S.C. § 2721(b)(1), which states that drivers' "[p]ersonal information" "may be disclosed . . . [f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."

The district court found no dispute of material fact that Principal Thorn engaged Brown's services for a "law enforcement purpose in anticipation of a potential safety threat." J.A. 585–86. The court also concluded, as a matter of federal law, that Brown's actions qualified as a "use" of the DMV photos by a law enforcement agency in carrying out the law enforcement "function" of maintaining school safety. J.A. 586–87. Based on those conclusions, the court ruled that a "reasonable factfinder would conclude Defendants did not obtain [the McMichaels'] driver's license photos in an unpermitted manner under the [Act]." *Id.*

---

[4] Section 2724(a) gives individuals a private right of action under the Act.

The McMichaels argue that the district court made several errors in reaching that conclusion. We address each in turn.

1.

The McMichaels first contend that Brown wasn't carrying out the "function" of a law enforcement officer when he obtained the DMV photographs. The Defendants counter that maintaining school safety is a law enforcement function, and that Brown acted to carry out that function. We must therefore determine: (1) whether, as a matter of law, maintaining school safety constitutes a valid law enforcement function under § 2721(b)(1) and (2) if there is any genuine dispute of material fact about whether Brown used the photos to carry out that function.

Since the Driver's Privacy Protection Act doesn't define the word "function," we must give it its "ordinary meaning." *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In this context, the ordinary meaning of "function" is akin to "purpose" or "intended role," such that we read the statute to allow law enforcement agencies to obtain DMV photos to carry out their purpose or intended role. *Function*, *Oxford English Dictionary* (3d ed. 2017), https://www.oed.com/view/Entry/75476?rskey=uJR7to&result=1#eid (last visited December 30, 2020) ("An activity or mode of operation that is proper or natural to a person or thing; the purpose or intended role of a thing."); *Function*, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/function?src=search-dict-hed

(last visited December 30, 2020) ("The action for which a person or thing is specially fitted or used or for which a thing exists.").

While at least one other federal appellate court analyzing the Act has looked to state law to determine the scope of a state agency's "function," *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1223 (11th Cir. 2009), it doesn't matter in this case whether we must consult federal or South Carolina law on the subject. Under either, a law enforcement agency's purpose or intended role is to maintain public safety. *United States v. Chappell*, 691 F.3d 388, 399 (4th Cir. 2012) ("The police function serves a significant salutary purpose in protecting public safety . . . ."); *Arthurs ex rel. Estate of Munn v. Aiken Cty.*, 525 S.E.2d 542, 548 (S.C. Ct. App. 1999), *aff'd as modified* 551 S.E.2d 579 (S.C. 2001) (describing presumption under South Carolina law that statutes governing the duties of public officials, including police officers, "have the essential purpose of providing for the structure and operation of government or for securing the general welfare and safety of the public."). Common sense tells us that maintaining safety in the school system is part and parcel of maintaining public safety overall. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 580 n.7 (4th Cir. 2010) ("[S]ummary judgment does not require ignoring logic or common sense to favor the nonmoving party.").

The McMichaels' argument to the contrary misses the mark. They contend that, because Brown was JICHS's school resource officer during the school year, we should analyze § 2721(b)(1)'s law enforcement exception in this case in tandem with the South

8

Carolina law that sets out a school resource officer's duties. That statute states that a school resource officer is:

> a person who is a sworn law enforcement officer pursuant to the requirements of any jurisdiction of this State, who has completed the basic course of instruction for School Resource Officers as provided or recognized by the National Association of School Resource Officers or the South Carolina Criminal Justice Academy, and who is assigned to one or more school districts within this State to have as a primary duty the responsibility to act as a law enforcement officer, advisor, and teacher for that school district.

S.C. Code Ann. § 5-7-12(B). The McMichaels contend that if we read § 2721(b)(1) to cover school resource officers' actions, we would allow all school advisors or teachers to obtain DMV photos without permission because section 5-7-12 includes "advis[ing]" and "teach[ing]" among school resource officers' primary duties.

That argument misunderstands section 5-7-12. Since the statute's own terms require that school resource officers act as "law enforcement officers" as well as advisors and teachers, it simply doesn't apply to *any* school advisor or teacher. Rather, it applies only to teachers and advisors who are also "sworn law enforcement officers," have completed the requisite training, and are assigned to a school district to act in part as law enforcement officers. *See id.* (listing a school resource officer's duties and required training in the conjunctive). Thus, using section 5-7-12 to color § 2721(b)(1)'s law enforcement exception wouldn't permit a school's non-law-enforcement personnel to take advantage of the exception.

In short, we agree with the district court's conclusion that maintaining public and school safety is a valid law enforcement function that justifies access to DMV records.

2.

We next consider whether Officer Brown's actions constituted a "use" of the DMV photos to "carry out" the law enforcement function of maintaining school safety. In *Senne v. Village of Palatine*, the Seventh Circuit carefully considered how courts should determine whether a defendant used DMV information for a purpose consistent with the Driver's Privacy Protection Act. 695 F.3d 597, 606 (7th Cir. 2012). The *Senne* court focused on the words "for use" in § 2721(b)(1) to reason that a defendant falls within the law enforcement exception only if he actually makes use of the information he obtained, uses it "for the identified purpose," and does not "exceed the scope of the . . . exception." *Id.* We agree with our sister circuit's understanding of the Act's requirements.

It's undisputed that Brown used the DMV photos. Both sides agree that he printed them, left them on the desk in the school's security office, and included them in the information packet that he distributed to the off-duty officers.

The McMichaels primarily argue that Brown didn't use the photos for his identified purpose—maintaining school safety—or that if he did, his actions exceeded that purpose. They first assert that, since Brown admitted that the McMichaels likely posed no immediate threat on the day of Kristina's termination, his use of the DMV photos couldn't have been related to law enforcement. But the McMichaels cite no authority suggesting that law enforcement officers may act only to address imminent or ongoing emergencies, as opposed to potential future threats. Indeed, while Principal Thorn called Brown to campus on July 6 in part to secure the campus that day, Brown understood Thorn to be equally

10

concerned with preventing future retaliation from aggrieved former employees and the McMichael family.

The McMichaels argue that Thorn's statements, which Brown relayed in his deposition, constitute inadmissible hearsay. But the material issue here is not whether the McMichaels in fact posed a threat to the school at some point during the summer—it's whether Thorn's concerns gave Brown a reason to act to ensure the school's safety. The Defendants therefore rely on Thorn's statements for their effect on the listener, not for their truth, and they are admissible for that purpose. *Graves v. Lioi*, 930 F.3d 307, 325 n.15 (4th Cir. 2019), *cert. denied sub nom. Robinson v. Lioi*, 140 S. Ct. 1118 (2020) (citing *United States v. Safari*, 849 F.2d 891, 894 (4th Cir. 1988), for the proposition that "a statement is not hearsay if it is offered . . . to show the effect on the listener").

Thus, Brown's understanding of the McMichaels' history and relationship with JICHS support the Defendants' concern that the McMichaels could have posed a future threat to the school. Kristina told Brown before her termination that her family had "guns in the[ir] house." J.A. 386:1–6. Brown had also heard that T.M. asked his father to buy him a shotgun because T.M. could no longer legally buy one after his arrest.[5] And Brown

---

[5] Brown heard this from Celeste Monette, who in turn heard it from Kristina. Though that chain of statements may appear at first glance to be triple-hearsay, every link is admissible. Celeste's statement to Brown is admissible for its effect on Brown as the listener. *Lioi*, 930 F.3d at 325 n.15. Kristina's statement to Celeste is admissible as a statement by a party opponent. Fed. R. Evid. 801(d)(2). And T.M.'s request that his father buy him a gun isn't hearsay at all. *United States v. Sinclair*, 301 F. App'x 251, 253 (4th Cir. 2008) ("A question or inquiry is not a statement, and therefore is not hearsay unless it can be construed as an intended assertion.").

11

knew that JICHS had recently expelled T.M., and heard Wilson threaten that the school would "be sorry" for terminating his wife.  J.A. 386:21–387:9.

The McMichaels say that Brown wasn't legitimately concerned about school safety because he never reported any concerns to other law enforcement agencies or opened an official police investigation into the McMichaels.  But there's no evidence that Brown usually took such actions when school-safety concerns arose or that any policy or regulation required him to do so.  To the contrary, Brown testified that, while he obtained a DMV photo once before in connection with an official investigation, he has also obtained DMV photos "multiple times" in response to circumstances that didn't result in criminal charges.  J.A. 396:21–397:19.  Brown's failure to open a criminal investigation before obtaining the photos in this case is therefore consistent with his past practice and doesn't suggest that his concerns were insincere or unfounded.  The McMichaels' speculation that a truly concerned school resource officer would have opened an investigation before obtaining DMV photos can't stave off summary judgment.  *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).

The McMichaels next argue that the Defendants could not have had any valid safety concern about them in particular because Brown's information packet also included information about, and photos of, the other two terminated finance department employees.  But that evidence is consistent with the Defendants' position that Brown obtained the photos to identify every individual who wasn't allowed back on campus.  Indeed, the termination letter that all three finance department employees received stated that they no longer had permission to be on campus without an appointment.  Similarly, the record

12

reflects that Brown "was told by somebody at the school" that the school had issued a "no trespass" notice to Wilson McMichael.[6] The fact that JICHS may have had safety concerns about other individuals as well doesn't discredit or diminish the school's concerns about the McMichaels.

3.

Finally, the McMichaels make a few misguided credibility arguments. They first appear to assert that the district court should have discounted Brown's testimony based on a years-old, unrelated disciplinary action against him for entering a civilian's room without permission or a warrant. Brown's disciplinary history doesn't help the McMichaels. For one thing, litigants can't avoid summary judgment by merely calling into question the credibility of witnesses testifying against them—they must introduce *some* affirmative evidence that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[I]f the [moving party] has made a properly supported motion, the [nonmoving party] may not respond simply with general attacks upon the [moving party's] credibility, but rather must identify affirmative evidence from which a jury could find that the [nonmoving party] has carried his or her burden[.]"). As discussed above, the McMichaels haven't identified such evidence.

For another, the disciplinary report isn't admissible in the way that the McMichaels rely on it. While parties may dig into a witness's prior acts for the purpose of establishing

---

[6] The McMichaels contend that this statement is hearsay, but it is admissible for its effect on Brown, not to show that Wilson actually received a no trespass notice.

13

his character for truthfulness or untruthfulness, Fed. R. Evid. 608(b), we fail to see what impact Brown's disciplinary report has on that character. In essence, the McMichaels contend that the district court should have used Brown's prior conduct to draw an inference that he acted improperly to obtain the DMV photos in this case. But that's a textbook example of inadmissible "other acts" evidence. Fed. R. Evid. 404(b)(1) ("Evidence of [a] crime, wrong, or [other] act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

The McMichaels also claim that the district court viewed as less credible Celeste Monette's testimony that Brown didn't act to ensure the school's safety. But even taking Celeste's testimony at face value, it doesn't create a factual dispute. Celeste testified that Brown's use of the photos was offensive and embarrassing, and that other people may have been able to see the photos on the security desk. But those facts don't contradict Brown's testimony that he used the photos to help secure the school. Brown's use of the photos could be related to law enforcement, offensive and embarrassing to the McMichaels, and potentially visible to others all at the same time.

In sum, the uncontroverted evidence demonstrates that Brown used the DMV photos for a law enforcement purpose. The district court therefore properly granted summary judgment to the Defendants on the Driver's Privacy Protection Act claim.

B.

We next consider the McMichaels' claim that JICHS defamed them. To prove a defamation claim in South Carolina, a plaintiff must demonstrate: "(1) a false and defamatory statement was [published]; (2) the unprivileged publication was made to a third

14

party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Argoe v. Three Rivers Behavioral Health, L.L.C.*, 710 S.E.2d 67, 74 (S.C. 2011). South Carolina courts have also long held that a plaintiff can't prove a defamation claim without evidence that the defamatory statement harmed the plaintiff's reputation in her community. *Capps v. Watts*, 246 S.E.2d 606, 610 (S.C. 1978) ("The very essence of an action for defamation is that the plaintiff has suffered damage as a result of the injurious effect of the defamation upon his reputation."); *Argoe*, 710 S.E.2d at 74 ("The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.").

The district court rejected this claim primarily because the McMichaels submitted no evidence showing that JICHS published any defamatory statement. On appeal, the McMichaels argue that JICHS defamed them per se and through insinuation. We disagree.

Statements may be defamatory per se when they "charge the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession." *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 309 (S.C. 2012). To qualify as defamation per se, the "defamatory meaning of a message or statement" must be "obvious on the face of the statement." *Holtzscheiter v. Thomson Newspapers, Inc.*, 506 S.E.2d 497, 501 (S.C. 1998) (using as an example of a defamatory per se statement "[Person] A is a thief.").

15

It isn't entirely clear what statements the McMichaels contend are defamatory per se. To the extent they argue that JICHS's termination letter addressed to Kristina was defamatory, their argument fails because that letter doesn't state that Kristina is unfit for her profession—it says that the school has eliminated her position for budgetary reasons. Moreover, there's no evidence in the record to suggest that JICHS's stated reason for terminating Kristina was untrue, and true statements can't defame. *A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183, 196 (4th Cir. 2002) (citing *WeSav Fin. Corp. v. Lingefelt*, 450 S.E.2d 580, 582 (S.C. 1994)).

The McMichaels cite *Johnson v. Dillard's Inc.*, 2007 WL 2792232, at \*18 (D.S.C. Sept. 24, 2007), for the proposition that "it is possible for an act of termination to be actionable defamation under South Carolina law." Appellants' Br. at 22. That may be true as a general statement, but the McMichaels both ignore the *Johnson* court's ultimate decision and extend that court's reasoning too far.

The *Johnson* court granted summary judgment against the plaintiff on her defamation claim when the facts showed that a uniformed officer escorted her out of a retail store after her termination. *Johnson*, 2007 WL 2792232 at \*18. While the court recognized that escorting an employee off the premises can constitute a defamatory statement when additional evidence shows that other people thought the employee was terminated for some "type of criminal or unlawful activity," the court found that the plaintiff had presented no such evidence. *Id.*

The same is true here. Officer Brown escorted Kristina off campus when JICHS terminated her, and there's no admissible evidence that her former colleagues thought that

16

JICHS did so because of any criminal or unlawful conduct. To the contrary, as discussed above, Kristina's termination letter plainly states that JICHS eliminated her position for budgetary reasons, and the district court properly ruled inadmissible the McMichaels' hearsay evidence about her former colleagues' opinions of her termination.

Moreover, after distinguishing the plaintiff's circumstances from cases in which South Carolina courts have let juries decide defamation claims, the *Johnson* court cited several cases to support its conclusion that, "where a terminated employee was merely walked off the premises . . . by a uniformed officer, the [employer's] conduct was not defamatory as a matter of law." *Id.* *Johnson* therefore helps JICHS more than the McMichaels.

To the extent that the McMichaels claim that Brown's placement of their photos on the security desk was a defamatory "statement," it would not be defamation per se because its meaning is far from obvious. Even if it could mean that JICHS thought that Kristina was unfit for her profession, it could also mean any number of other things, including what the JICHS argues it means: that security officers simply needed the McMichaels' pictures to identify them in the future.[7]

---

[7] The McMichaels also argue in passing that Kristina's termination and Brown's placement of the DMV photos on the security desk constituted defamation per se because, through those events, Defendants conveyed that Kristina and Wilson had "done something illegal or committed a crime." Appellants' Br. at 23. Even if the Defendants' conduct could be interpreted as a statement that the McMichaels committed a crime, their argument fails because, as discussed above, the Defendants' conduct could also reasonably mean other things. Moreover, statements accusing a plaintiff of having committed a crime are defamatory per se only when the crime charged is one of "moral turpitude." *Fountain*, 730 S.E.2d at 309; *see also Green v. Hewett*, 407 S.E.2d 651, 652 (S.C. 1991) ("Crimes of

17

Nor did the combination of JICHS's termination letter and Brown's actions constitute defamation through insinuation.  An insinuation can be defamatory if "it is false and malicious," its "meaning is plain," *Eubanks v. Smith*, 354 S.E.2d 898, 901 (S.C. 1987), and it harms the plaintiff's reputation, *see Kennedy v. Richland Cty. Sch. Dist. Two*, 833 S.E.2d 414, 423 (S.C. Ct. App. 2019), *petitions for rev. dismissed* No. 5669, 2020 S.C. LEXIS 34 (Mar. 9, 2020) (explaining the reputational harm requirement in a case involving defamation through insinuation).

*Kennedy*, on which the McMichaels rely heavily, illustrates why the defamation-by-insinuation claim alleged here fails.  The *Kennedy* court held that an intra-school-district email about a security guard created a triable issue of material fact on his defamation claim, even though no one outside the district saw the email.  833 S.E.2d at 423–24.  But, contrary to this case, the *Kennedy* plaintiff presented substantial evidence that the email harmed his reputation.  Another security guard testified that the insinuation in the email—that the plaintiff could no longer be trusted with keys to the school—rendered him "worthless" as a security guard and may have cost him a promotion for which he was otherwise eligible. *Id*. at 423, 423 n.7.  And the plaintiff "demonstrated his reputation in his community was damaged when he testified that his role as a mentor in his church significantly decreased following the publication of the email." *Id*. at 423.

---

moral turpitude involve acts of baseness, vileness, or depravity in private and social duties . . . contrary to the customary and accepted rule of right and duty between man and man."). The McMichaels do not allege the crime that they believe the Defendants accused them of, much less show that it is one of moral turpitude.

There's no such evidence in the record here. The McMichaels point to conversations during social gatherings in which they, the Monettes, and another part-time school employee "laughed" and "joked" about the McMichaels being "James Island's [M]ost [W]anted." J.A. 432:9–433:2, 434:20–435:6, 443:25–444:11, 449:18–450:2. But no reasonable juror would compare jokes between friends to the *Kennedy* plaintiff's reputational harm.

The McMichaels also point to statements about the photos made to Kristina by other school staff outside of school. According to Kristina, several staff members mentioned that her photo was in the office and said things like "I can't believe they did that to you" and "they are making you out to be a monster." But the district court ruled that these statements were inadmissible hearsay and the McMichaels don't dispute that ruling on appeal—they simply reference the statements again without addressing their admissibility. Even if the statements were admissible, however, they don't show any damage to Kristina's reputation. If anything, they show that members of her community were sympathetic to her position. That stands in contrast to *Kennedy*, where members of the plaintiff's community became suspicious of him because they were concerned that he was a thief.

In sum, the McMichaels haven't demonstrated that any genuine dispute of material fact exists as to their claim for defamation. The district court therefore correctly granted summary judgment in JICHS's favor.

C.

Finally, we consider whether the Defendants unlawfully invaded the McMichaels' privacy when Brown placed their DMV photos in the school security office. There are

19

"three distinct causes of action under the rubric of invasion of privacy" in South Carolina: "1) wrongful appropriation of personality; 2) wrongful publicizing of private affairs; and 3) wrongful intrusion into private affairs." *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 759 (S.C. 2009). Before the district court, the McMichaels pursued the second and third theories. They now concede, however, that they can't support a claim for wrongful intrusion. So, we consider only whether the Defendants wrongfully publicized the McMichaels' private affairs.

The elements of a claim for wrongful publicizing are: "(1) publicizing, (2) absent any waiver or privilege, (3) private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a person of ordinary sensibilities." *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 130 (S.C. 1999). The district court determined that the McMichaels didn't demonstrate a genuine issue of material fact as to the first element, and we agree.

The McMichaels again rely heavily on *Kennedy* to argue that Officer Brown's conduct was unlawful because sharing information among school district employees is sufficient "publication" to support an invasion of privacy claim. But *Kennedy* involved a defamation claim, not an invasion of privacy claim, and that distinction matters. *See Kennedy*, 833 S.E.2d at 423. In South Carolina, invasion of privacy claims require plaintiffs to show "publicity, as opposed to mere publication." *Swinton Creek Nursery*, 514 S.E.2d at 131–32 (quoting Restatement (Second) of Torts, § 652D cmt. a (Am. L. Inst. 1977)) ("Publicity . . . differs from publication . . . in connection with liability for defamation."). Publicity "means that the matter is made public, by communicating it to

20

the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id*. at 132.

The fact that the Monettes, Koll, and a few other people saw the DMV photos doesn't mean that the Defendants publicized any of the McMichaels' private information. That group is simply too small to give rise to a claim for wrongful publicizing. *Snavely v. AMISUB of S.C., Inc.*, 665 S.E.2d 222, 227 (S.C. Ct. App. 2008) ("Publicity involves disclosure to the public, not just an individual or a small group."). Moreover, as discussed above, Brown didn't disclose the DMV photos to that group—Marty Monette did. And the Supreme Court of South Carolina has expressly rejected the theory that a defendant can "spark[ ] the flame of publicity" by showing private information to one person who then causes the information to become public. *Swinton Creek Nursery*, 514 S.E.2d at 132 ("[S]uch an approach would effectively eviscerate the requirement that the *defendant* be the one to have publicized the private information.").

Nor did Brown wrongfully publicize the McMichaels' private information by placing their DMV photos on a desk in the security office where passersby could view them. The McMichaels rely on Celeste Monette's testimony to argue that members of the public could view the photos through a window to the office during the week and on Sundays when a church group used the campus. But Celeste didn't testify that anyone actually saw the photos, and the McMichaels cite no other evidence that news of the photos reached the public at large. Celeste's speculation that the broader public was aware of the photos isn't enough to survive summary judgment. *See Emmett*, 532 F.3d at 297.

Moreover, Kristina testified that she knew of no one who saw the photos other than JICHS employees. South Carolina courts have held that a defendant who makes information available only within a workplace or organization hasn't publicized the information. *Brown v. Pearson*, 483 S.E.2d 477, 483–84 (S.C. Ct. App. 1997) (no publicity when "[t]here is no evidence that either of the Respondents 'publicized' Appellants' complaints other than within the official channels of the local church and Conference and to those charged with dealing with such allegations."); *J.R. v. Walgreens Boots All., Inc.*, 470 Fed. Supp. 3d. 534, 552–53 (D.S.C. July 2, 2020) (finding no publicity occurred when only internal employees could access the information at issue, even though it was a large group of internal employees in a separate division of the company).

Because the Defendants didn't publicize any of the McMichaels' private information, the district court correctly resolved this claim in the Defendants' favor.

IV.

For the reasons given, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*